JUSTICE SAMOUR, dissenting.
¶ 48 The majority's decision to discharge the rule to show cause is tethered to the district court's factual finding that Fox's parents did not need to be present during the consultation with Leventhal. But the district court did not hold an evidentiary hearing to resolve the conflicts in the exhibits submitted with the parties' briefs. Instead, it made credibility assessments, resolved evidentiary conflicts, and reached factual findings based entirely on the paper record. Because I believe the district court erred in failing to hold an evidentiary hearing, I respectfully dissent.
¶ 49 The district court found that Fox was fully able to communicate, relate her symptoms, and describe her chiropractic adjustment in detail when she met with Leventhal and, therefore, her mental capacity was not so diminished that her parents' presence was necessary to assist during the consultation. In making this factual determination, the district court considered what are best characterized as the parties' offers of proof and concluded that defendants' proffer was more persuasive than Fox's. Respectfully, I cannot endorse this approach.
¶ 50 Without the benefit of live testimony, the district court deemed the affidavits submitted by Fox and her parents unconvincing. In those affidavits, Fox and her parents declared, under oath and subject to penalty of perjury, that:
• the stroke affected nearly every aspect of Fox's life, including her ability to live independently for a significant period of time;
• Fox's ability to concentrate, remember, and understand complex issues was significantly impaired when she met with Leventhal;
• during the timeframe of the consultation with Leventhal, Fox needed her parents to help her "understand a number of important issues in [her] life";
• Fox's parents spent significant time with Fox after the stroke to make sure she was doing well physically and "understood everything going on around her and was making well-reasoned decisions"; and
• Fox's parents attended the meeting with Leventhal because Fox and her parents realized that she needed assistance *606 in understanding some of the complex issues that would come up during the meeting and because she did not feel she had the mental capacity to make decisions that were in her best interest concerning this lawsuit.
¶ 51 Not only did the district court dismiss these attestations, it ignored the report regarding Fox's neuropsychological evaluation. That report observed that tests conducted on Fox revealed, among other things:
• difficulties and impairments with aspects of her ability to maintain her attention and to process information;
• variability in her memory and ability to learn tasks;
• an elevated level of psychological distress, which included experiencing symptoms associated with depression and anxiety; and
• likely ongoing impairments with neuropsychological functioning.
Notably, the report mentioned that, since the evaluation had occurred approximately fifteen months after the stroke, it was likely that Fox had already experienced the majority of the anticipated recovery. In other words, had the tests been administered shortly after the stroke and before the consultation with Leventhal, the results may well have reflected greater neuropsychological impairment.
¶ 52 On the other side of the ledger were Facebook messages sent from Fox's account. These messages, which were sent before the consultation with Leventhal, indicated that: (1) Fox was "doing well" and expected to make "a full recovery"; and (2) her caregivers had told her that her symptoms had disappeared, that she was "a medical mystery," and that it was "as if nothing ... happened" to her. The district court took these comments at face value and accorded them great weight. But the Facebook remarks, which were not made under oath, were contradicted by Fox's and her parents' sworn statements, and were at least undermined by the neuropsychological report. Yet the district court resolved the conflicts in the exhibits-and in the process necessarily made credibility assessments-on a cold record. It is now axiomatic that "[a] cold record is a poor substitute for live testimony." People v. Scott , 198 Colo. 371, 600 P.2d 68, 69 (1979). It is for that reason that "[f]actfinding is the basic responsibility of district courts, rather than appellate courts." Pullman-Standard v. Swint , 456 U.S. 273, 291, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (quoting DeMarco v. United States , 415 U.S. 449, 450 n., 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974) ).
¶ 53 The majority cites People in Interest of M.S.H. and People in Interest of A.J.L . -the former for the proposition that it is "the trial court's province to judge the credibility of the witnesses," 656 P.2d 1294, 1297 (Colo. 1983), and the latter for the proposition that it is for the district court to resolve conflicts in the evidence, 243 P.3d 244, 250 (Colo. 2010). See maj. op. ¶ 32. I wholeheartedly agree with both principles. But the district court did not, and could not, properly perform either function because it failed to hold an evidentiary hearing. How could the district court properly assess the credibility of the witnesses without observing them and receiving their live testimony? And how could the district court properly resolve the conflicts in the exhibits without properly assessing the credibility of the witnesses?
¶ 54 Invoking a basic tenet of appellate jurisprudence, the majority points out that we do not set aside a district court's factual findings unless we determine that those findings are so clearly erroneous as to find no support in the record. However, the very reason we generally employ such a deferential standard in reviewing a district court's factual findings is that the district court is in a unique position to assess the credibility of live witnesses, and therefore, to resolve conflicting evidence and determine the historical facts. People v. Trujillo , 784 P.2d 788, 792 (Colo. 1990), abrogated on other grounds , People v. Matheny , 46 P.3d 453 (Colo. 2002). As we have explained:
The sanctity of trial court findings is derived from the recognition that the trial judge's presence during the presentation of testimonial evidence provides an unparalleled opportunity to determine the credibility of the witnesses and the weight to be afforded the evidence which is before the *607 court. [Where] [t]he testimony of the parties [is] contradictory on almost every material point in controversy[,] [i]t is impossible to determine from the bare pages of the record whose testimony should be given credit relating to the facts. In such cases, the difficult task of finding those facts is best left to the trial court.
M.D.C./Wood, Inc. v. Mortimer , 866 P.2d 1380, 1384 (Colo. 1994) (quoting Page v. Clark , 197 Colo. 306, 592 P.2d 792, 796 (1979) ) (citation omitted).
¶ 55 Here, the factual findings deserve no deference because we are in the same position to do what the district court did. The district court did not observe, much less evaluate, the demeanor or the body language of any live witnesses-indeed, there were no live witnesses. By electing to make credibility assessments, resolve conflicts in the exhibits, and reach factual determinations on a cold record, the district court nullified its unique position to make factual findings and placed itself in the disadvantaged shoes of a reviewing court. The district court then proceeded to do precisely what a reviewing court abstains from doing because of the real danger of engaging in fact-finding on a cold record.
¶ 56 In the end, while the majority concludes that there is ample evidence in the record to support the district court's factual findings, it overlooks that there is equally ample evidence in the record to support contrary factual findings. Given the conflicts in the exhibits, the only way to properly settle the parties' factual dispute was to hold an evidentiary hearing.
¶ 57 Because the district court made credibility assessments, resolved the conflicts in the exhibits, and reached factual findings based entirely on the paper record without holding an evidentiary hearing, I respectfully dissent. The district court necessarily engaged in speculation to determine what to believe. In my view, this was error. I would make the rule to show cause absolute and remand for an evidentiary hearing in accordance with the legal test endorsed by the majority.
I am authorized to state that CHIEF JUSTICE COATS and JUSTICE BOATRIGHT join in this dissent.