**Herbert M. YIELDING,
Plaintiff-Appellant,**

v.

**CROCKETT INDEPENDENT SCHOOL
DISTRICT, et al.,
Defendants-Appellees.**

No. 82–2010.

United States Court of Appeals,
Fifth Circuit.

June 16, 1983.

Bob Hall, Houston, Tex., for plaintiff-appellant.

J.B. Sallas, Crockett, Tex., Richard Brooks Hardee, Tyler, Tex., for defendants-appellees.

Before GOLDBERG, GEE and POLITZ, Circuit Judges.

GEE, Circuit Judge:

The issues raised by this appeal require us once again to enter the area of uneasy tension between a public employee's rights as a citizen and his employer's power to discharge him for unsatisfactory performance. Today's case concerns no liberty or property interest; Appellant Yielding had neither, as he concedes. Instead, he advances First Amendment claims falling within the other great division of such discharge cases. See *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), of which more later.

Mr. Yielding is a veteran teacher and secondary school administrator whose contract was not renewed by the defendant school district, which served Crockett, a small East Texas city, and its environs. In consequence, he brought this civil rights action, asserting that his release was improperly occasioned by his exercise of First Amendment rights. At a bench trial the district court rejected his claims, finding that permissible reasons supported his release, that it was not done in retaliation for his exercise of constitutional rights, and that the defendants would have released him even absent his protected activities. On appeal, he contends that these findings are clearly erroneous as to fact, as well as insufficiently specific in identifying and considering his rights protected by the Constitution. The case is controlled by *Doyle,* and on balance we conclude that the factual findings of the trial court are not clearly erroneous. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). So concluding, we affirm.

Mr. Yielding served Crockett Independent School District (CISD) as a junior high school principal for over ten years, com-

mencing in 1967 and ending in 1978, under two different superintendents. The evidence shows that both of these superiors experienced difficulties with Yielding's performance as a school administrator—essentially the same difficulties—and that each attempted to correct his performance.

A memorandum dated in February 1972, for example, from the earlier Superintendent to Mr. Yielding sets out at length various concerns of the school board about deficiencies in his performance before that date and admonishes him to correct them. Among these are that "Some parents, patrons, students, teachers and co-workers feel they are not able to talk with you in person or on the telephone without fear of being embarrassed, intimidated, or of being treated as an inferior person." Others were of his unwillingness to allow parents or patrons to explain problems and points of view when they conferred with him, of his need to develop the "knack of listening," of home visitations made by him to parents in the "Black Community" at "times and places that has caused real concern," and of overly familiar, if well-intended, gestures toward female students. The tone of this memorandum is unmistakably stern and that of its admonitions serious. Despite this, behavior by Mr. Yielding deemed unsatisfactory resulted in his being offered only a probationary contract for the 1974–75 school year.

The later superintendent, who took over in July 1974 and remained until Yielding's release, experienced similar problems. In a memorandum to Mr. Yielding dated in February 1975, the new superintendent pointed out many of the same deficiencies in performance as had the former: complaints by parents of inability to get Yielding to listen to their problems and of finding it difficult to talk to him, the latter complaint echoed by another school administrator; of statements made by Yielding at faculty meetings indicating an intent to run his campus as he pleased and an insubordinate attitude toward higher authority; and of a particular incident when Yielding barged into a private conference between the superintendent and one of Yielding's subordinates who had requested a transfer, announcing that he wished to be present because the conference probably pertained to him. Although the memorandum recommended Yielding for a nonprobationary contract for the 1975–76 year, it admonished him to correct these deficiencies on pain of future probation or release.

Again, however, in February 1977, we find the superintendent admonishing Yielding about the same or similar failings on his part. These comments are set out in the margin.[1]

At last, in February 1978, Superintendent Darnell apparently became convinced that further remonstrances would be useless. The record contains his final memorandum to Mr. Yielding:

> I feel that before effective communications can take place between two or more people, they must have the ability to make one another feel at ease in their presence—you do not have this ability due to the manner in which you handle yourself.
>
> I feel that when two or more people come together in an attempt to solve problems, they should be considerate of each other's feelings—you appear to be only interested in stating and defending your points.
>
> Until you see the need to modify your behavior in reference to the above, I see the same problems continually confronting us, becoming more and more serious with time.
>
> I have tried to work with you as a member of the administrative team, but with little success. It is now your responsibility to initiate the necessary change.

1. Since my arrival in Crockett as Superintendent of Schools, I have found it very difficult to both understand you and work with you as a fellow administrator. Although I believe you have the capabilities of being a fine administrator, your weaknesses, that have been pointed out to you many times in the past, are still apparent, with little evidence of change on your part.

As I try to analyze the situation in a positive and sincere manner, the only conclusion that I can derive from my analysis is that our philosophies differ greatly.

> I feel that each administrator should be loyal and supportive of the entire school system—your interest lies only with your campus. I feel that members of the administrative team should work cooperatively when problems arise—you are always on the defensive.

In February of 1977, during the annual administrator evaluation conference, I pointed out to you, both in writing and orally, my concerns in reference to your performance as Junior High School Principal. During the conference I stated that until you see the need to change your behavior I could only see the same problems continually confronting us, becoming more serious with time. In evaluating your performance since last February, I feel these problems have become more serious, with little or no effort on your part to change.

To be specific, I feel your performance in the following areas prevent you from being an effective administrator in the Crockett Independent School District:

Your ineffectiveness as a member of the administrative team, as evidenced by the reluctance of substantially all administrators in wanting to discuss or meet with you to work out solutions to problems, with meetings usually becoming more tense as they go along, ending with little being accomplished. You appear to be only interested in stating and defining your points with little consideration given to others.

The manner in which you talk with parents by telephone and in person. Parents still have the feeling of being embarrassed, humiliated, and talked down to during conferences with you. Seldom do they feel that you listen to what they have to say.

Your visits or attempts to make home visitations in the Black community.

The manner in which you appear to be non-supportive of the Superintendent's Office.

The memo concluded by stating that Darnell would recommend that the school board not renew Yielding's contract. After a lengthy executive session with Yielding, it voted unanimously not to renew it. He pursued unsuccessful administrative appeals, obtained other employment, and filed this suit.[2]

After trial, the district judge, in holding for the defendants, made the following findings that Appellant Yielding asserts and we agree are the crucial ones in the case:

11. The Board of Education for the Crockett Independent School District did not renew the Plaintiff's employment contract for the 1978–79 school year for the reason that the Plaintiff was ineffective as an administrator. The Plaintiff's administrative position demanded loyalty, confidence and harmony with his superiors and the ability to deal effectively with parents.

12. The Plaintiff did not have a harmonious relationship with either of the Superintendents he served under and he was overbearing, intimidating and insensitive in his dealings with others.

13. The Board of Education would have reached the decision not to renew the Plaintiff's contract based on his performance record as a whole even if the decision had [not] been based in part on the administrator's conduct protected by the First and Fourteenth Amendments.[3]

6. The nonrenewal of the Plaintiff's contract was not taken in retaliation for the Plaintiff's exercise of any constitutionally protected rights.[4]

Yielding's first complaint of the findings, as we understand it, is that the court did not sufficiently specify which particular acts of his were entitled to First Amendment protection. Since the court did not do so, the argument runs, it cannot be told whether or not the judge correctly identified protected acts; and his other determinations turning on that identification cannot be tested. We agree with Mr. Yielding that a more clear statement on these points

2. Another, carrying on his administrative appeals, pends in state court.

3. The context of the findings makes clear that the bracketed negative was omitted by inadvertence.

4. This finding appears among the court's conclusions of law. We view it, however, as one of fact, and the court's order states that "any conclusion of law which is a finding of fact shall be deemed a finding of fact."

by the trial court would have been helpful. We need not decide, however, whether in a case where which of the employee's acts were constitutionally protected was more doubtful a remand for clearer findings might be necessary; for here the four acts which Yielding claims he did in the exercise of his First Amendment rights are clearly either within or without them, so clearly so that the trial judge cannot have been in doubt.

Three patently were: his refusal to support a school bond issue publicly, his remonstrance to a local newspaper which published enrollment figures for his campus that he felt were too low, and his complaints at school board meetings about inattention to various maintenance problems at his school. One patently was not: his visitations and attempted visitations at the homes of black parents to discuss their children's school problems. The first three actions by Yielding are clearly protected as political activity, communication with the press, and petitions for redress. The latter, though Yielding argues strenuously that it partakes of civil rights and freedom of association, plainly is not.[5]

Yielding's other two points attack findings of the trial court as clearly erroneous, the findings that he was not discharged in retaliation for constitutionally protected activity and that he would have been discharged regardless of it. Since upholding either finding requires affirmance, we discuss the latter only. Before doing so, we find it helpful to review principles laid down in the controlling case, *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The facts of Doyle's case are similar to those of Yielding's.

Doyle, an untenured teacher, was released at the end of his contract. Upon requesting the reason for his discharge, he was told that it resulted from his "notable lack of tact in handling professional matters which leaves much doubt as to your sincerity in establishing good school relationships." This generality was followed by a reference to two specific incidents, one in which he raised the matter of a proposed dress code for teachers with a local radio station and another in which he made an obscene gesture to disobedient female employees whom he was supervising.[6] The district court held for Doyle in his suit for claimed violation of his First and Fourteenth Amendment rights, the Sixth Circuit affirmed in an unpublished opinion, 529 F.2d 524, and the Supreme Court granted certiorari. 425 U.S. 933, 96 S.Ct. 1662, 48 L.Ed.2d 174.

The Court's opinion on this point[7] focuses on Mr. Doyle's communication with the media about the proposed dress code.[8] In its

---

**5.** On brief, appellant asserts: "[T]he complaint about 'visits ... in the Black community ....' represents the kind of reproach which was commonplace thirty years ago, ... The racist implications are unmistakeable (why the 'Black' community?) and the intrusion of government into private associations is just as plain, ..." To the contrary, there are no racist implications, rights of private association are clearly not involved, and Yielding's rhetorical question has a simple answer. That answer is that it was in the "Black community" that Yielding made or sought to make his home visitations, that it was from black parents that complaints about them came, and that they were in no sense attempts at "private associations." Instead, they were themselves governmental intrusions, done in the name of his public office—intrusions that the parents found unwelcome and protested.

**6.** Other incidents related by the Court's opinion indicate that, like Yielding, Doyle was not of a retiring disposition: a mild physical altercation with another teacher, eventuating in suspensions and a teacher walkout; an argument over food portions served him in the school cafeteria; and his use of a mild obscenity on one occasion in referring to students. In short, it appears that although Doyle was more obstreperous than Yielding and less highly placed, both could be aggressive, abrasive and intransigent.

**7.** Other portions of it treat of jurisdiction, Eleventh Amendment immunity, and other questions presented.

**8.** We assume that the Court did not treat of the obscene gesture since it, like Mr. Yielding's home visitations, was palpably not protected by the Constitution—however expressive it may have been.

analysis, the Court accepts both the district court's determination that the communication was a protected action and that it was a "substantial" (the Court prefers and equates "motivating") factor in Doyle's dismissal. Noting the trial court's additional determination that other adequate grounds, independent of First Amendment rights or their exercise, existed for Mr. Doyle's release, the Court remanded for a determination by that court whether the school board "had shown by a preponderance of the evidence that it would have reached the same decision as to the respondent's reemployment even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576. Our analysis of *Doyle* completed, we return to the case in hand.

It is one where *Doyle* is closely in point. This record reveals an able public servant, possessed as an administrator of both strengths (which the quoted memoranda from his superiors recognize) and of besetting and persistent failings. Over the years, in the face of repeated admonitions, Mr. Yielding persisted in attitudes and practices which his superiors believed diminished his effectiveness as an administrator. Over the years they told him so, to little or no avail. These attitudes and characteristics, noted by the trial court, of stubbornness toward superiors and insensitivity toward others manifested themselves occasionally in actions that were constitutionally protected. Finally, in consequence of these and a myriad other unprotected actions, his superior despaired of his efforts to rectify Yielding's manner and conduct and recommended his release, and the school board unanimously adopted that recommendation. The trial court, viewing the same record as do we, and having the additional advantages we have so often enumerated of seeing the parties and witnesses, their demeanor, and so on, determined as fact that the board would have followed Darnell's recommendation to release Yielding even absent his protected activities.

Yielding attacks the court's finding, pointing out that at their depositions, taken three and one-half years after Darnell recommended Yielding's release, Darnell and one board member refused to speculate by hindsight about whether they might have acted differently were one factor or another changed—the home visitations are instanced—in the calculus of Yielding's conduct. Indeed, it is true that no board member or supervisor squarely asserted in testimony that he would have favored Yielding's release absent the protected conduct. From this, Yielding reasons that no evidence supports the finding attacked. We do not agree.

To the contrary, there was a great deal, albeit indirect. To determine what a person, let alone a group of persons, would have done in the past under circumstances different from those that took place is necessarily a difficult and speculative endeavor, one on a par with determining the motive with which an accused acted in a criminal case. For differing reasons, neither is likely to be the subject of direct testimony. Indeed, we might have some reservations regarding confident assertions by hindsight, years after the fact, in such a matter. But the determination is one called for by *Doyle,* and we think it is amply sustained here by the record evidence we have discussed. Since it is, the judgment of the district court must be

AFFIRMED.