## In re AIR CRASH AT DALLAS/FORT WORTH AIRPORT ON AUGUST 2, 1985.

**Kathleen E. CONNORS, on behalf of the beneficiaries of, and as Executrix of the Estate of Edward M. Connors, Deceased, and Delta Air Lines, Inc., Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**Jean R. NASSICK, on behalf of the beneficiaries of, and as Executrix of the Estate of Nick N. Nassick, Deceased, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 89–1946.

United States Court of Appeals, Fifth Circuit.

Jan. 2, 1991.

Rehearing Denied Jan. 29, 1991.

---

Alan Wilson, Law, Snakard & Gambill, Fort Worth, Tex., for Connors.

John H. Martin, G. Luke Ashley, Maureen Murry, Michael R. Berry, Thompson & Knight, Dallas, Tex., for Delta Airlines, Inc.

Marvin K. Adams, Fillmore & Harrington, Fort Worth, Tex., for Nassick.

Clay Warner, Gary Green, Herndon, Va., for amicus curiae Air Line Pilots Ass'n, Intern.

Kathlynn G. Fadely, Douglas Coleman, Dept. of Justice, Torts Branch, Civil Div., Washington, D.C., for U.S.

Before GOLDBERG, GEE, and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

A little after 6:00 p.m., on August 2, 1985, the crew of Delta Flight 191 attempted to land at Dallas–Fort Worth International Airport (DFW) despite their knowledge of the presence of a thunderstorm on near final approach, between their aircraft and the runway. The ensuing air disaster claimed the lives of most of the passengers and crew, as well as that of a motorist whose automobile was struck by the careening aircraft.

In a bench trial, the district court concluded that, although both the aircrew and the government ground personnel were negligent, the negligence of the air traffic controllers in failing to warn of the storm was not a proximate cause of the tragedy because the crew of Flight 191 required no such warning—knowing what was known on the ground of the storm and more—and would not have acted on it. It therefore gave judgment for the United States. The court's opinion and findings may be found at 720 F.Supp. 1258. Delta Airlines and the estates and survivors of certain crew members appeal, chiefly asserting as error that the court misapplied the Texas law of proximate cause and that its findings of historical fact are clearly erroneous in various critical respects.

## FACTS

The opinion of the district court is lucid and exhaustive, and we recapitulate its findings here in part only for the convenience of the reader of our decision.

Flight 191 departed Fort Lauderdale, Florida, at 4:21 p.m. EDT, August 2, 1985. The aircraft was a Lockheed L–1011, with an on-board weather radar which the district court found was not used during the fatal approach to DFW airport. The following is a brief[1] summary of the events leading up to the Flight 191 crash.

| Time | Event |
|---|---|
| 5:12:26 | Flight 191's Captain Connors receives approval from government air traffic controllers to route his approach to DFW over Blue Ridge, a path with heavier air traffic but better weather conditions than the Scurry area, over which Flight 191 originally was routed. |
| 5:25:00 | The meteorologist at the DFW Central Weather Service Unit (CWSU), an agency that aids air traffic controllers in the dissemination of weather information to aircraft pilots, leaves his post to take a dinner break, not to return until after Flight 191 crashed. |
| 5:35:26 | Flight 191 receives a recorded weather dispatch from DFW that had been prepared at 4:45 p.m. The dispatch tells Flight 191, among other things, that |

1. The district court opinion includes a 20 page minute by minute (and in some cases second by second) chronology of the "most significant events" from 5:03:59 p.m. until 6:05:56 p.m. on August 2. This abridged version was culled from the district court's opinion.

| Time | Event |
|---|---|
| | the temperature was 101, the dew point was 67, and that planes were making visual approaches to the airport. (The gap between the temperature and dew point should have been a clue to the pilots that thunderstorms could develop.) |
| 5:45:00 | Various personnel at DFW begin to notice clouds building up north of the airport. |
| 5:50:00 | Thunderstorm Cells "D" and "C" began to form and appear on ground radar. |
| 5:51:19 | Flight 191 Second Officer Nassick observes: "Looks like it's raining over Fort Worth"; an unknown voice comments ... "Dallas." |
| 5:52:00 | Cells D and C would appear on Flight 191's on-board radar at about this time, were it operating. |
| 5:55:00 | An air traffic controller in the DFW tower observes cloud-to-ground lightning east-northeast of the airport. This lightning bolt was associated with a grey cloud and an area of rain. |
| 5:55:00–6:00:00 | Three airport mechanics stop to look at the storms off the north end of the runways. One later testified that the "wall of water" was the heaviest rain he had seen during his nine years at DFW. |
| 5:56:26 | Controllers notify all aircraft: "There's a little rain shower just north of the airport and they're starting to make ILS approaches...." |
| 5:58:00 | The ground radar left unmanned by the meteorologist's dinner break should be indicating a VIP (Video Integration Process) level of 3 for Cell D. It was the practice of the CWSU to notify air traffic controllers of VIP level 3 storms. |
| | Other pilots in the same area as Flight 191 note heavy storm activity on their on-board weather radars. If activated, Flight 191's on-board radar would have indicated to the cockpit crew that Cell D was an intense storm. |
| | Cell D hovers a few hundred yards off the north end of the DFW runways; Cell C, a much less intense storm—essentially just a rain-shower—lies just to the north of Cell D. If operating, Flight 191's on-board radar would have penetrated Cell C to reveal Cell D as a dangerous storm. |
| 5:58:00–5:59:00 | An air traffic controller at DFW informs his supervisor that he has heard thunder, assumes that there were thunderstorms outside. |
| 5:59:43 | An air traffic controller broadcasts that there is a "little bitty thunderstorm" that "looks like a little rain shower" at DFW. This controller apparently is talking about Cell C. Flight 191, tuned to a different radio frequency, misses this transmission. |
| 5:59:47 | As Flight 191 turns on its approach path, First Officer Price jokes "we're gonna get our airplane washed." Flight 191's crew can see Cell D straight ahead and to the left of them and are obviously flying close to some type of convective activity and rain. |
| 6:00:00 | An air traffic controller in the DFW tower again observes lightning to the east-northeast of the runways. |
| 6:00:00–6:04:00 | A pilot on the ground waiting to take off observes the worst thunderstorm he has ever seen: "It was a solid sheet or wall of water moving toward the airport with unbelievable intensity." |
| 6:01:20 | A controller repeats the general broadcast (which Flight 191 again does not hear) that "a little rain shower just popped up north of the airport." This apparently refers to Cell D. |
| 6:02:30 | Flight 191 is cleared for instrument landing on runway 17L. |
| 6:03:31 | An air traffic controller advises another Delta flight that "we're getting some variable winds out there due to a shower on short final out there north end of DFW." Flight 191 apparently hears this transmission because it is on the same frequency. An unidentified crew member of Flight 191 remarks "stuff is moving in." |

| Time | Event |
|---|---|
| 6:03:32 | Pilots on the ground waiting to take off see what appears to be a waterspout in the dark sky and heavy rain off the approach end of runway 17L. |
| 6:03:58 | Flight 191's Captain Connors remarks to the air traffic controller that Flight 191 "is out here in the rain, feels good." |

At about the same time, the following conversation takes place between an air traffic controller in the DFW tower and the traffic control supervisor. Controller: "We've been busy with these SWAPS and hadn't paid any attention, but that is heavy, heavy rain off the approach end of both runways...." The Supervisor, referring to his radar, replies "yeah, I can see that." (The district court found that these government employees were referring to Cell D and that the air traffic controller was aware of this weather situation at or before 6:03:30.)

| 6:04:18 | The following conversation occurs in the cockpit of Flight 191. |

First Officer Price: "Lightning coming out of that one."

Captain Connors: "What?"

First Officer Price: "Lightning coming out of that one."

Captain Connors: "Where?"

First Officer Price: "Right ahead of us."

(At this time the aircraft is over five miles out, at an altitude between 2000 and 1500 feet.)

| 6:04:00–<br>6:05:00 | Pilots on the ground waiting to take off see what looks like a tornado off the end of the DFW runways. This phenomenon is also referred to in testimony as a wall of water, a shaft of heavy rain, a hail shaft, and a microburst. These pilots apparently also see lightning in this storm. |

An aircraft immediately ahead of Flight 191 on final encounters extremely heavy rain and light-to-moderate turbulence as it lands on runway 17L.

| 6:05:08 | Captain Connors comments "672 in the baro," thereby telling Price that he intends to go down to 200 feet and at that time will decide whether to land or execute a missed approach. |
| 6:05:04–<br>6:05:18 | Flight 191's air speed suddenly increases by 20 knots, from 153 to 173 knots, because of increased headwinds as the plane enters Cell D. (See segment B–C, on Appendix A "Downdraft Shear.") |
| 6:05:19 | Captain Connors recognizes air speed increase and tells Price to "watch your speed." |
| 6:05:21 | Captain Connors warns Price, "You're gonna lose it all of a sudden, there it is." Connors was referring to an impending sudden loss in airspeed that would occur when the surging headwinds decreased. To urgent commands of "push it up, push it up, way up" by both Connors and the Second Officer, Price opens the throttle. Engine sounds increase immediately. |
| 6:05:30 | Connors states "that's it." Ground proximity alarms are sounding. |
| 6:05:35–<br>6:05:36 | Flight 191, on the verge of stalling out, begins an involuntary roll to the right, even though the pilot attempts to control it. Henceforth Flight 191 is no longer attempting to land but instead is attempting a missed approach. |
| 6:05:52 | Flight 191 goes in 6,336 feet short of the runway and approximately 360 feet off-line, bounces several times and breaks up. |
| 6:05:56 | The air traffic controller instructs Flight 191 "Delta go around." |

■ These facts are essentially undisputed.[2] Everyone agrees that the airplane crashed when it encountered an unusually strong downdraft windshear[3] in the Cell D thunderstorm. The dispute in this case, however, centers around whether the Delta flight crew or the government air traffic controllers were to blame for the airplane's entry into Cell D. The district court held: (1) the flight crew's negligence was a proximate cause of the accident, (2) Delta was not negligent in training its pilots to detect and avoid windshear, (3) the Delta meteorology and flight control dispatch department was not negligent in failing to give Flight 191 updated weather information, (4) Captain Connors' negligence in flying while he was taking medication was not a proximate cause of the accident, (5) the controllers were not negligent in failing to route Flight 191 to a different runway, and (6) the air traffic controllers were negligent in not relaying weather information to Flight 191, but this negligence was not a proximate cause of the crash. The only factual findings assigned as error are (5) and the proximate cause aspect of (6).

## ANALYSIS

Before entering on a discussion of appellants' points of error, it is well to remind ourselves of two basic considerations, one legal and the other factual, which bear on the case.

The first of these is the preeminent authority of the captain, the airplane commander. Although aircraft operational safety is the responsibility both of ground personnel and of the air crew, "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 91.–3(a) F.A.R. On all matters drawn before the Court by this appeal—including the choice of runway and the decision whether to land or to go around—the captain of Flight 191 had the final word.

The second is that Flight 191 was in no necessity to brave the known thunderstorm over the end of the runway: fuel was ample, even to land at its alternate airport; and, except for various discrete squalls in the area, the weather was not troublesome.

*Runway Change*

■ The foregoing principles go far to dispose of appellants' contention of clear error in the court's finding that the controllers were not negligent in failing to order Flight 191 to land on a different runway. The court correctly observed that:

> The Air Traffic Controller manual never requires that a runway be changed; it only lists criteria to be considered in contemplating a change ... wind is the primary factor in electing to change runways ... the ATC manual directs that, if feasible, the runway most aligned with the wind is to be used when wind velocity is greater than or equal to five knots ... there was no wind shift before the accident.

Appellants contend that these findings are clearly erroneous, but cite no evidence countering the court's conclusions. Appellants also maintain that the district court ruled that mere compliance with the ATC manual conclusively established that the controllers had exercised ordinary care. We disagree. A fair reading of the district court's opinion shows that the court considered the handbook and ordinary controller practice as evidence of what would be ordinary care under these circumstances. The district court did not clearly err in finding that the controllers were not negligent in failing to order Flight 191 to land on a different runway. The runway in use was the one most nearly aligned with the prevailing wind; another aircraft had just landed safely on it; and, had the aircrew of Flight 191 wished to avoid the small thunderstorm over the end of it, they had every right to break off their approach, abort the landing, and hold until the runway cleared

---

2. Appellants maintain that the aircraft's onboard radar was functioning but do not attack the district court's contrary finding as clearly erroneous. Thus for our purposes the finding stands.

3. A windshear is a sudden change in the wind's speed or direction. Appendix A explains the effect which a downdraft windshear has on an aircraft attempting to land.

or another more to their liking became available.

*Proximate Cause*

The district court held that the air traffic controllers were negligent in not transmitting to Flight 191 the following pertinent weather information that was known to the air traffic controllers before the crash:

(1) A thunderstorm was occurring off the approach end of the threshold of runway 17L.

(2) "Heavy, heavy" rain was observable from the Tower. This heavy, heavy rain was described by eyewitnesses as a wall or curtain of water, portions of which resembled a tornado.

(3) The presence of cloud to ground lightning strikes in the vicinity of the storm to the north of the field beginning as early as 5:55 p.m. and continuing up until at least shortly before the accident. At least 5 FAA employees in the Tower saw the lightning before the accident.

(4) The presence of cumulonimbus (thunderstorm) clouds, observed by the official NWS weather observer at 5:51 p.m. This observer promptly reported his sightings to the Tower personnel.

(5) Radar information showing precipitation returns on the north end of the runway.

After finding that the government air traffic controllers were negligent, however, the district court went on to hold that:

Any failure of the air traffic controllers to warn a pilot of the presence of a storm in his path cannot be regarded as a continuing proximate cause after the pilot himself discovered its presence, appreciated the danger, and decided to fly ahead into it. *Black v. United States*, 441 F.2d 741, 745 (5th Cir.1971), *cert. denied*, 404 U.S. 913 [92 S.Ct. 233, 30 L.Ed.2d 186] (1971). The Court is of the opinion that the crew of Flight 191 possessed substantially all of the weather information potentially available from government sources. In fact, the crew was aware of

additional conditions unknown by government sources, *e.g.*, windshear and lightning in Cell D. The Court considers the failure of governmental employees to pass on weather information to have been inconsequential to the fate of Flight 191 in that there is no evidence that the crew would have acted differently with this confirmation of information already known.

A. *Appellants' Arguments*

 Proximate cause in Texas law consist of two elements: (1) cause in fact ("but for" causation) and (2) foreseeability. Appellants commence their argument on this head by suggesting that we may review the district court's conclusion on proximate cause *de novo*. We disagree; although the law applied by the district court is reviewable *de novo*, the court's ultimate determination of proximate cause, like a finding of negligence, is a finding of fact that is reviewable under the clearly erroneous standard only. *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); 53 Tex.Jur.3d, Negligence § 129.

Appellants next advance a variety of contentions that the district court applied improper law to the facts in this case:

First, appellants maintain that the district court fashioned and applied an erroneous rule of law to conclude that the controllers' negligence was not a proximate cause of the accident. Appellants argue that the *Black*[4], case, cited by the district court as support for its conclusion on proximate cause, applied Louisiana proximate cause law, which defined proximate cause as:

the primary or moving cause ... when negligence is established, liability attaches for all injurious consequences that flow therefrom until diverted by intervention of some efficient cause that makes the injury its own, or until force set in motion by a negligent act has so far spent itself as to be too small for the laws' notice.

---

**4.** *Black v. United States*, 441 F.2d 741 (5th Cir. 1971).

They suggest that this definition of proximate cause does not allow for the possibility of multiple proximate causes of an event. Texas, on the other hand, defines proximate cause as:

> that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Appellants claim that, by following *Black*, the district court applied Louisiana's proximate cause law as of 1971, whereas the district court should have applied Texas' current proximate cause law.

They also contend that the district court, in the portion of its "Memorandum Opinion" cited at p. 1085 above, essentially held that the flight crew's negligence in not aborting the landing after they sighted lightning dead ahead and first noticed a windshear constituted a new and independent cause of the accident that broke the chain of causation from the controllers' negligence. Appellants suggest that under Texas law the crew's negligence could not constitute a new and independent cause because, in Texas, only an act or omission of some outside person or agency not a party to the lawsuit can constitute a new and independent cause.

Next, Appellants contend that the district court, in holding that the flight crew's later negligence overrode any negligence on the part of the air traffic controllers, revived the old precomparative negligence doctrines of last clear chance and discovered peril. Appellants' argument on this point arises from the district court's observation that "[a]ny failure of the Air Traffic Controllers to warn a pilot of the presence of a storm in his path cannot be regarded as a continuing proximate cause *after* the pilot himself discovered its presence, appreciated the danger and decided to fly ahead into it." (emphasis added).

Finally, appellants assert that, under the proper standard of Texas proximate cause law, it was conclusively established that the controllers' negligence was a proximate cause of the accident. They argue that the controllers' negligence was a "but for" cause of the accident if proper warnings and advice probably would have caused a reasonably prudent crew, unaware of the actual weather conditions, to avoid Cell D before entering it at 6:04:00 or to execute a missed approach before 6:05:35 p.m. Appellants argue alternatively that even if a subjective standard should be applied to the "but for" element, the actual conduct of the Delta crew indicates that they would have heeded proper warnings from the controllers.

### B. *Appellants' Arguments Considered*

Appellants' most serious contention is the first set out above: that the trial court applied some law of proximate cause other than that of Texas and hence arrived at an erroneous result. We review such claims of legal error *de novo*, but a careful examination of this one leaves us unconvinced.

■ Almost twenty pages into the trial court's opinion, and after a most searching consideration of the facts, it turns to the law. At 720 Federal Supplement, pages 1278 and 1279, the court states clearly that the governing law is that of Texas, briefly outlining that law and referring to representative Texas authorities discussing proximate cause. The court's discussion of Texas proximate cause law alone covers over half of a printed page. The trial judge has enjoyed a long experience of the law of Texas—his native state—and it has long been the view of our Circuit that the views of such jurists as to state law are deserving of great weight. *See Westinghouse Electric Supply Co. v. Wesley Construction Co.*, 414 F.2d 1280, 1281 n. 1 (5th Cir.1969). By a parity of reasoning we are entitled to assume a general knowledge of that law on the part of such a magistrate, certainly of its basic principles.

■ That there may be more than one proximate cause of an event is such a principle of the Texas (and general) law of

proximate cause, and the suggestion that the experienced trial judge may have been ignorant of such a basic element of Texas tort law is a bold one indeed. The fact that further on in the opinion the court cites to *Black*, a federal case applying Louisiana law and arriving at a similar judgment on *facts* similar to those of today's case, falls far short of persuading us that the court, in the process of delivering its painstaking opinion, somehow forgot what law it was applying after having announced and expounded it in some detail. But even if that were so, which we do not concede, on this point the law of Louisiana is uncharacteristically the same in general import as the law of Texas.

Nor does the somewhat elided quotation from *Black*, borrowed by us from appellant's brief and set out above at p. 1085, do full justice to the Louisiana definition. Indeed, the language removed by appellants is all but identical to the Texas definition. We restore and emphasize it below:

> ... The proximate cause of an injury is the primary or moving cause, *or that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the accident could not have happened, if the injury be one which might be reasonably anticipated or foreseen as a natural consequence of the wrongful act.*

*Black*, 441 F.2d, at 743–44.

In addition, it is and long has been the law of Louisiana that there may be more than one proximate cause of an event; indeed, this view is peculiar to neither Texas nor Louisiana law, but rather is the generally prevailing one. *Miller Car Washes, Inc. v. Crowe*, 245 So.2d 485, 495–96 (La.

App.1971) (citing 65 C.J.S. 1179–83). Thus, while there may be esoteric nooks where Louisiana law of proximate cause differs from that of Texas, on the broad principles controlling here there is no significant variance; and had the trial court followed Louisiana law no harmful error would have accrued.

 We take a similar view of appellants' contentions that the trial judge revived and applied the long-defunct doctrines of last clear chance and discovered peril, or viewed the aircrew's persistence in landing despite the storm as a new and independent cause of the accident. It is certainly possible to read the passages which appellants seize upon and quote in such a manner, just as it is possible to read visions of archery into a reference to an upshot. To do so, however, it would be necessary for us to assume that the court was ignorant (and uninformed by counsel) of a decade's developments in Texas tort law, a most unlikely circumstance. Instead, we understand the courts temporal references as simply observations along the way to a determination that the sole proximate cause of the catastrophe was the deliberate decision of Flight 191's experienced crew to enter Cell D, despite having observed the tell-tale lightning that clearly marked it as a thunderstorm.[5]

 Sometimes even Homer nods; and—despite the aircrew's long experience—we cannot gainsay the court's apparent view that when Flight 191 chose to fly into a thunderstorm at a low altitude and speed it chose to dice with death. The better choice is represented by the standard pilot's maxim, quoted in United States Exhibit 741: "If in doubt, get out"![6] Nor

---

**5.** In addition, the factors underlying the concepts of last clear chance and discovered peril remain fully viable today in the practical calculus of identifying causes of an event, despite the abolition of their status as formal, legal doctrine. For legal doctrine may be subject to change by judges, but reason and logic are not: Say what the court will, two and two remain four; and when we seek to identify the efficient causes of an event, phrases such as "She knew what she was getting into" and "He should have checked first to be sure it wasn't loaded" come crowding in willy-nilly.

**6.** Appearing as well in another version: "There are old pilots, and there are bold pilots; but there are no old, bold pilots." Appellants attack as clearly erroneous the court's factfinding that the aircrew "possessed substantially all of the weather information potentially available from government sources." The attack is futile, however; for it is apparent, indeed undisputed, that the crew knew all of the information that the court held the traffic controllers negligent in not transmitting (listed in text at p. 1085) except

can we hold clearly erroneous the court's factfinding that telling the crew again what it already knew first-hand would have made no difference in its actions. The court's finding that the crew's deliberate decision to land through a known thunderstorm located at the end of the runway, when they could easily have gone around, was the sole proximate cause of this disaster is not clearly erroneous; and its judgment for the United States must therefore be

AFFIRMED.[7]

## APPENDIX A

---

## DOWNDRAFT SHEAR

There is a strong downdraft in the center of the cell. There is often heavy rain in this vertical flow of air. As the vertical air flow nears the ground it turns 90 degrees and becomes a strong horizontal wind, flowing radially outward from the center. Point A represents an aircraft which has not entered the cell's flow field. The aircraft is on speed and on glide slope. At Point B the aircraft encounters an increasing headwind. Its airspeed increases, and it balloons above the glide slope. Heavy rain may begin shortly. At Point C the "moment of truth" occurs. If the pilot does not fully appreciate the situation, he may attempt to regain the glide slope and lose excess airspeed by reducing power and pushing the nose down. Then in the short span of time between Points C and D the headwind ceases, a strong downdraft is entered and a tailwind begins increasing. The engines spool down [go to idle], the airspeed drops below V.ref, and the sink

---

*the appearance of the storm as viewed from the control tower, a matter of little consequence.*

7. This case was well-tried and superbly presented on appeal by both sides; but our study of the record makes plain that although the question whether *any* amount of cause should be attributed to the air controllers is a close one, the question whether a decision that none should be is clearly erroneous is not. Further, we take some comfort in the circumstance that, since Texas does not maintain a pure comparative negligence system, the outcomes of Mrs. Connor's and Mrs. Nassick's wrongful death actions and of Delta's claim for the value of its aircraft would not be altered unless the air controllers were found to be at least equally at fault with the aircrew—a finding which on this record would almost surely be "clearly erroneous."

rate becomes excessive. A missed approach initiated from this condition may not be successful. Note that a missed approach initiated at Point C (or sooner) would probably be successful since the aircraft is fast and high at this point. Note also that the pilot of an aircraft equipped with a groundspeed readout would see the telltale signs of a downburst cell shortly after Point B; i.e., rapidly increasing airspeed with decreasing groundspeed.[24]