927 F.2d 596
 56 Fair Empl.Prac.Cas. 480
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Margaret A. SUITE, Plaintiff-Appellant,
v.
CLINCHFIELD COAL COMPANY, Division of the Pittston Company;
Max Bailes; Robby Skeens; Joe Prendergast; John
J. Rippe; Don Wilson, Defendants-Appellees.
 No. 90-2054.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 7, 1990.
Decided Feb. 28, 1991.
As Amended May 6, 1991.
 
 Appeal from the United States District Court for the Western District of Virginia, at Abingdon. Glen M. Williams, Senior District Judge. (CA-87-356-A)
 Betty Jean Hall, Dumfries, argued for appellant; J. Davitt McAteer, Washington, D.C.; Susan D. Oglebay, Damascus, Va., on brief.
 Louis Dene, Dene & Dene, Abingdon, Va., argued for appellees.
 W.D.Va.
 AFFIRMED.
 Before K.K. HALL and MURNAGHAN, Circuit Judges, and NORTON, United States District Judge for the District of South Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 This is a Title VII discrimination case. Appellant Margaret Suite brought suit against appellee Clinchfield Coal Company and other officers and employees of Clinchfield (hereinafter collectively referred to as "Clinchfield") alleging that she was denied a position as a lab technician on the basis of her sex. From a judgment in favor of Clinchfield, Suite appeals, claiming (1) that the trial judge's ruling that she had established a prima facie case at the close of her case constituted a ruling in her favor on the Title VII claim which became the "law of the case"; and (2) that the trial judge erred in finding that Suite was not qualified for the position she sought, that Clinchfield articulated a neutral nondiscriminatory reason for refusing to hire Suite, and that the reason articulated was not a pretext.
 
 I.
 
 2
 The Clinchfield Coal Company owns and operates a mining operation, part of which is its Central Lab. In late January of 1986, the Central Lab posted a job opening for a lab technician. On February 3, 1986, Suite, a "laid-off" miner, "panelled" for the position.* After completing an interview and a test, Suite was informed that she would not be offered the job because she was not qualified. Thereafter, a male was hired for the same position.
 
 
 3
 At trial, Suite introduced the following pertinent testimony as part of her case. First, she introduced the testimony of John Burden, a Central Lab employee since 1959. Burden testified concerning a meeting of the "Mine Committee" at which certain members discussed the need for a new Lab Technician position at Central Lab to fill the void left by employees taking vacation time. Burden testified that at a later meeting, committee members also discussed the fact that Suite had panelled for the job.
 
 
 4
 He testified that during his employment with Central Lab, he had never heard of a test being administered to anyone considered for employment, and that Central Lab had never employed a woman. He testified that the person eventually hired for the job was a man, Ross Miller. Finally, he testified that in his opinion Suite was qualified to fill the position of Lab Technician.
 
 
 5
 The next witness for Suite was Eddie Horn, a Central Lab employee since 1958. Horn testified that in his opinion, the test administered to Suite contained "trick" questions. Horn also testified that while he had been at Central Lab, no job applicant had ever been given a test, and no female had ever been employed there. He also testified that he observed Ross Miller receiving some on-the-job training after coming to work at Central Lab.
 
 
 6
 At this point in the presentation of Suite's case, the trial judge suggested that Suite proceed to make out her prima facie case first, then allow Clinchfield to put forth its evidence regarding the reasons Suite was not hired, at which time Suite could submit her evidence in rebuttal.
 
 
 7
 Counsel then presented the testimony of Suite. Suite testified that after panelling for the lab technician position, she received a phone call from Robbie Skeens, Personnel Manager at Clinchfield, who inquired as to her training. Suite informed him that she had trained at Reedy Creek Lab under James Clay and Mark Mullins. She testified that she trained for two months, though not every day, and that on the days she trained, she did so for approximately four to five hours. Skeens told her that he needed to check into her qualifications, and that he would call her back after doing so. Skeens called Suite back and told her to come for an interview the following day with Lab Director John Rippe. When Suite arrived for her interview, Rippe gave her an oral test comprised of questions about laboratory procedures. The following day, Skeens called Suite to tell her that Rippe had declared her unqualified for the position and that she would not be hired.
 
 
 8
 At this point, Suite rested her case, and the trial judge entertained a directed verdict motion from Clinchfield. The trial judge denied the motion, ruling that Suite had established a prima facie case of sex discrimination. Thereafter, Clinchfield proceeded with the presentation of its defense.
 
 
 9
 The first defense witness was Joseph Prendergast, who served as Manager of Industrial Relations at Clinchfield at the time Suite panelled for the job. Prendergast checked on Suite's qualifications by contacting the Reedy Creek Lab, but found the information unsatisfactory because it showed that she had only received some training in several basic areas. Prendergast personally visited Reedy Creek Lab, where he spoke to Mark Mullins, the Lab Technician who had trained Suite. Mullins was not very specific, but said that Suite had been there to observe for a few weeks for two or three hours in the afternoons. Mullins said that Suite had done the analysis work but had not done any sampling or preparation work for sampling.
 
 
 10
 Prendergast then returned to Central Lab to discuss this information with Rippe. Rippe began to question him as to what he had discovered about other tests that Suite might have been trained to perform. Prendergast suggested that Rippe contact Mullins himself. After Rippe talked to Mullins and reported back, Prendergast felt that the three reports as to Suite's training were in conflict, especially with regard to the amount of time that she had actually spent training. Prendergast also understood that Suite was never put in a position to perform the tests without Mullins' supervision. Prendergast then suggested that Rippe interview Suite to determine the extent of her qualifications.
 
 
 11
 Rippe was then called as a defense witness. He testified that in late December 1985 or early January 1986, a local committee of the Central Lab met to discuss, among other topics, the creation of a position to cover the void left by lab technicians on vacation leave, and to ease an increased workload. Rippe then met with the union to explain the availability of such a position. Rippe testified that he explained that he needed someone who could move from shift to shift and that there was no time to train anybody. Thereafter, Rippe posted the job notice for the lab technician position. Another lab employee, James Clay, informed Rippe that he had heard that Suite had been training at Reedy Lab.
 
 
 12
 At a February 16 meeting, two lab employees, James Clay and John Burden, accused Rippe of unfair labor practices claiming that he refused to hire Suite because she was a woman. Rippe explained that he had not even spoken to Suite at that point. Thereafter, Rippe commenced a check into Suite's qualifications. The report from Reedy Creek Lab indicated that Suite had received training for two weeks in five procedures. Rippe also directed other questions to Prendergast regarding what he had learned about Suite's training in specific areas, but Prendergast was unable to answer these questions.
 
 
 13
 Rippe then called Mullins at Reedy Creek Lab to question him regarding Suite's training. Mullins told Rippe he was not sure of the amount of time Suite spent there, but thought it was a month to a month and a half, although not on a day to day basis. Mullins described four tests Suite was trained to perform, but told Rippe that he had not trained Suite in "float and sink" testing, screening or sampling, although Suite had watched him perform sampling. Rippe did not receive an exact answer as to the amount of training Suite had received on the four tests Mullins did train her to run. Rippe also testified that there was "no comparison" between Central Lab and Reedy Lab because Central Lab was required to run a much greater variety and quantity of tests. Rippe also testified that he had concerns because, based on his discussion with Mullins, it appeared that the areas in which Suite had trained would have comprised only ten percent of the work she would have had to do at Central Lab. Mullins did not expressly recommend Suite to Rippe for the position.
 
 
 14
 Rippe further testified that due to his doubts as to Suite's qualifications, and after speaking with Prendergast, he drafted some specific questions to ask Suite concerning basic points of procedures employed at the Central lab. Rippe was assisted in drafting the test by another technician, Dan Wilson, who had worked at Central Lab since 1962. During the interview, Rippe learned for the first time that James Clay had also trained Suite. After Suite answered the questions and completed the interview, Rippe, along with Wilson, looked over the results in order to determine how much Suite knew about the procedures that were required to do the job adequately. Suite's score on the test was approximately 35 percent. Rippe testified that based on the test and interview, he concluded that Suite lacked sufficient knowledge of basic skills or understanding of laboratory terminology and was not qualified to be a lab technician.
 
 
 15
 As to the person eventually hired for the position, Ross Miller, Rippe testified that he did not give Miller the test until after he was hired, at which time Miller scored 90 percent. However, Rippe testified that Miller had six years experience with Clinchfield, and had previously been employed as a lab technician "in seniority." Rippe checked Miller's work record, talked to the chief lab technician at the laboratory where Miller had worked, and was satisfied that Miller was qualified. On cross-examination, Rippe admitted that he had no experience in test creation. Rippe also admitted that he remarked that he "needed a beer" shortly after learning that Suite had panelled for the job. Rippe explained, however, that he was initially concerned about the lack of shower facilities for a woman, but that he had arrived at a solution driving home that day. He also testified that this remark was made because he was worried about Suite's training. His concern, he explained, was partially based on the fact that another Central Lab employee, Andrew Burden, had trained at Reedy Creek, and had presented a problem as far as experience and ability to perform tests at Central Lab.
 
 
 16
 Finally, with regard to the issue of the importance of knowing how to perform sampling, Rippe testified that although not all employees in the lab knew how to perform sampling, it would be necessary for the all-shifts person, the position for which Suite applied, to be able to take samples regularly.
 
 
 17
 The next defense witness was Skeens, the personnel manager who was responsible for interviewing and hiring at the time Suite panelled. Skeens testified that he pulled Suite's personnel record and found no lab technician experience, so he called her to ask about her qualifications. After learning that Suite had trained at Reedy Creek Lab, Skeens called and spoke to Mullins. Mullins told Skeens that Suite had been working with him for about two weeks and that he had been teaching her lab procedures. Skeens then relayed this information to Rippe and Prendergast. Skeens then notified Suite that she was to come in for an interview. Skeens sat in on the interview and test. Rippe thereafter called Skeens and told him that based on the test results, Rippe would have to disqualify Suite.
 
 
 18
 Ross Miller, the person eventually hired for the lab technician position, testified concerning his qualifications and responsibilities at Central Lab. Dan Wilson also testified concerning his own duties at Central lab, as well as the abilities of other lab employees to perform a number of tests, including "sampling." Wilson also testified that due to increased workload and vacation scheduling, there was no time for a training program for the person hired to fill the position. Wilson testified that, regarding Suite's qualifications, there was no evidence of sampling experience or laboratory experience with another lab, and that conflicting reports came in regarding her experience. Wilson also testified that he helped Rippe prepare the test which was given to Suite.
 
 
 19
 Additionally, defense witness James Clay testified that he trained Suite in December of 1985 and January and February of 1986 for a total of approximately eight to nine days. Clay also testified that he sent Suite to work with Mullins at Reedy Creek Lab to get some "hands on" training after the job notice was posted. Clay testified on cross examination that he had found Suite to be a fast learner, and that he felt the test given her was unfair. Clay also testified that, to his knowledge, Suite had never done any sampling.
 
 
 20
 Finally, defense witness Jane Newton testified regarding the importance of "sampling" and that it is a critical procedure as well as a difficult task. When Newton spoke to Mullins regarding Suite's training, Mullins told Newton that Suite was extremely nervous, "shook a lot," and "had difficulty catching on."
 
 
 21
 After this final witness, the defense rested and the judge asked counsel for Suite whether she was ready to proceed with her rebuttal witnesses. Counsel stated that there were no rebuttal witnesses.
 
 
 22
 The trial judge entered a judgment for Clinchfield based on findings of fact and conclusions of law which were issued from the bench on December 19, 1989. The trial judge concluded that the evidence was not sufficient to establish that Suite was qualified, notably that she was not qualified to do "sampling," which he found to be necessary to establish her qualification for the position sought. The trial judge also noted that the position offered was not a lab technician trainee position, but a lab technician position.
 
 
 23
 Suite made several post trial motions, including a motion based on her assertion that the trial court erred in finding appellant unqualified in light of his early ruling that she had made out a prima facie case. All motions were denied in an Order issued March 14, 1990.
 
 II.
 
 24
 Appellant Suite's assignments of error are four in number: (1) that when the trial court found that Suite had proved her prima facie case, it ruled, as a matter of law, that she was qualified for the position and that this became the "law of the case;" (2) that after Suite established her prima facie case, the trial court erred in finding that Clinchfield established a legitimate, nondiscriminatory reason for her rejection; (3) that since Clinchfield failed to establish a legitimate nondiscriminatory reason for refusing to hire Suite, the inference established by the prima facie case that plaintiff was qualified for the position stood, and therefore, as a matter of law, the denial of the job to Suite could only be found to be discriminatory and the trial court erred in not so finding; and (4) assuming that the defendant articulated a non-discriminatory reason, the trial court erred in failing to find that the reasons articulated were a pretext for discrimination. All four of these contentions relate to the application of the standard to be used in determining whether a case of discrimination has been established.
 
 
 25
 The applicable test for determining whether a case of discrimination has been adequately established is drawn from two Supreme Court cases: Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981), and McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). The test is that a plaintiff must show: (1) that she is a member of a protected class; (2) that she applied for and was rejected for a job for which the employer was seeking applicants; (3) that despite her qualifications, she was rejected; and (4) that after her rejection, the position remained open and the employer continued to seek applicants from persons of the applicant's qualifications.
 
 
 26
 If the plaintiff puts forth evidence to establish these four elements, she has made a prima facie showing. The defendant must then come forward with a neutral, nondiscriminatory reason for refusing to employ the plaintiff. Id. Once such a showing is made by the defendant, the plaintiff can then present evidence to show that the nondiscriminatory reason is untrue or pretextual. Id.
 
 
 27
 Suite established these elements in the presentation of her case. Once Suite established her prima facie case of discrimination, Clinchfield had to present its evidence to establish a neutral nondiscriminatory reason for its refusal to hire her. At the close of Suite's case, the trial judge ruled that she had established her prima facie case. Suite now contends that his ruling in this regard became the law of the case, which he could not later disavow by finding that the defendant had proven that the plaintiff was unqualified. This is a misapprehension of the applicable law and the shifting of burdens as provided for under the Burdine and McDonnell-Douglas proof schemes.
 
 
 28
 The only evidence before the trial court at the close of Suite's case tended to establish, among the other necessary elements, that she was qualified for the position sought. At that time, there was sufficient evidence to establish this, as well as the remaining elements of the prima facie case. This did not, however, establish as a matter of law that Suite was in fact qualified. To so hold would be to entirely deny Clinchfield any opportunity to rebut this evidence, which it is entitled to do. Accordingly, Suite's contention in this regard is without merit.
 
 III.
 
 29
 Appellant Suite's remaining contentions all relate to the sufficiency of the evidence to support the trial judge's factual findings. Specific findings of fact will not be reversed by this Court unless clearly erroneous or the result of an application of incorrect legal principles. Pullman-Standard v. Swint, 456 U.S. 273 (1982).
 
 
 30
 As to Clinchfield's articulation of its neutral, nondiscriminatory reason for refusing to hire Suite, the trial court held, and we agree, that there was evidence to support a finding that she was not qualified. As noted above, although Suite received some training, that training was deficient in several respects, including her ability to perform several of the tests necessary for an "all shifts" person to perform. Although Suite presented minimal evidence to establish her qualifications during her case, that evidence was sufficient only to withstand scrutiny under the prima facie evaluation. Clinchfield adequately rebutted this with evidence that Suite was, in fact, not qualified. Suite than chose not to call additional witnesses to rebut this evidence. Namely, Suite failed to call those witnesses who had actually trained her. Therefore, at the conclusion of all the evidence, there was ample evidence from which the trial judge could conclude that the defendant had established its neutral nondiscriminatory reason--that Suite was simply not qualified.
 
 
 31
 Suite also argues that the trial judge erred in refusing to find that the reason given for refusing to hire Suite was a pretext for discrimination. Although Suite did present some evidence in this regard, namely the evidence that she was administered a test, a practice previously practically never followed, and the evidence regarding Rippe's comment that he "needed a beer" immediately after learning that Suite panelled for the job, there was also ample evidence to support the trial court's conclusion that this was not a pretext. Again, the trial judge's findings in this regard are not clearly erroneous.
 
 
 32
 In summary, Suite did not adequately establish her qualifications. Additionally, Clinchfield established legitimate reasons for the methods used to determine Suite's qualifications, especially in light of the fact that it was difficult to ascertain the degree of her training or ability to perform the job. Rippe provided an explanation for his comments. It was within the trial court's discretion to believe or discredit those reasons, and under our standard of review, unless such a ruling is clearly erroneous, we will not reverse such a finding.
 
 IV.
 
 33
 For the reasons discussed above, this Court finds Suite's assignments of error to be without merit. Accordingly, the judgment of the trial court is
 
 
 34
 AFFIRMED.
 
 
 
 *
 This case arises within the framework of the National Bituminous Coal Wage Agreement of 1984, pursuant to which certain procedures are established for filling job openings. "Panelling" describes the process by which a person indicates on her panel form that she wishes to be considered for an available position. According to established procedure, an available position first goes to a bidder from the operation at which the opening exists. If no one from the operation panels for the position, Clinchfield is required to offer the job to the senior most qualified person from the pool of "laid-off" miners. If no qualified person from the pool panels, Clinchfield is free to hire "off the street."