**Suellen MORRIS, Plaintiff,**

v.

**SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Defendant.**

**Civ. A. No. 89–205–1–MAC (WDO).**

United States District Court, M.D. Georgia, Macon Division.

Feb. 20, 1992.

Mark R. Youmans, Page, Scrantom, Harris & Chapman, Columbus, Ga., for plaintiff.

Gregory J. Artis, Keith W. Kochler, David P. Berg, So. Bell Tel. & Tel. Co., Atlanta, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

Suellen Morris ("plaintiff") filed the present action on June 15, 1989, against her employer, Southern Bell Telephone and Telegraph Company ("Southern Bell"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). A nonjury trial was held in this court on August 28, 1991. The court, having considered arguments of counsel and the record as a whole, hereby makes the following findings of fact and conclusions of law.

### FACTS

1. Plaintiff, a female, had been employed by Southern Bell for approximately twenty-three years at the time of her termination on or about April 20, 1988. Nineteen of those years had been spent in the construction-installation-maintenance ("CIM") division of Southern Bell's Out State Distribution Department. The Out State Distribution Department handled the operational aspects of the telephone system for the geographic area of Georgia exclusive of greater Atlanta.

2. Before her discharge, plaintiff was a Plant Contract Supervisor ("PCS"), a first level management position. Plaintiff was one of two PCS's who dealt primarily with the work of the outside contractor (the other PCS was a male, Marshall Lawson).

3. Prior to October, 1987, plaintiff reported to G.R. Sweeney; thereafter, plaintiff reported to Johnny Lucas. These second level managers, in turn, reported to Alan Edmonson, the ultimate decisionmaker in this case.

4. In January, 1988, Southern Bell relieved plaintiff of her BSW duties and reassigned her to another area of the CIM division. Marshall Lawson assumed plain-

tiff's BSW duties at that time. Ex. A (Material Undisputed Facts).

5. Following her discharge, plaintiff filed a sexual discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on June 2, 1988, in which she contended that her discharge was unlawfully based on sex discrimination. The EEOC issued a right-to-sue letter to plaintiff on March 20, 1989.

6. At the time of her discharge, plaintiff was making a base salary of $33,600 per year. Her male counterparts were making a base salary of $37,900 per year. *See* Plaintiff's Ex. 44 (extract of personnel records).[1]

7. Plaintiff's duties as a PCS included evaluating the performance of outside contractors in the construction and installation of buried service wires ("BSW")[2] for Columbus, Georgia and the surrounding area. Specifically, plaintiff visited BSW sites and inspected the depth, length, and method of placement (hand trenched versus plowed) of the BSW to ensure accurate billing on the invoices submitted by the outside contractors.

8. The PCS was required to perform monthly or quarterly quality inspections on a minimum percentage (100 units or 15%) of the invoices submitted by the outside contractor and document her results.[3] These worksheets, in turn, were submitted to a second level manager for signature. Plaintiff's testimony.

9. The PCS was required to withhold payment to the outside contractor if an invoice was inaccurate or if BSW were improperly buried.

10. The PCS was also required to complete quarterly contractor performance reports. These reports were then reviewed by a second level manager. Lucas Deposition at 37. If the second level manager concurred in the report, he then forwarded it on to a Southern Bell contract administrator in Atlanta. However, if the second level manager observed any problems, it was incumbent upon him to take corrective actions. Sartin Deposition at 92.

11. In this regard, Johnny Lucas met with the outside contractor in October of 1987 to discuss problems Southern Bell was experiencing with BSW (specifically, shallow wires and excessive billing at the premium hand trenched rate). Plaintiff Testimony; Lucas Deposition at 38.

12. Pursuant to a set of guidelines entitled "Master Contract Work for Buried Service Wires," plaintiff and her male counterpart, Lawson, had the authority to reject substandard BSW work. *See* Defendant's Ex. 58 (paragraph 5.02). Plaintiff and Lawson were also authorized to require the contractor to fully comply with all the terms of the contract without incurring any additional expense to Southern Bell. *Id.* The PCS had no authority, however, to hire or fire a contractor. Edmonson Deposition at 26–27.

13. Southern Bell has experienced a history of problems with its various outside contractors and BSW. *See* Plaintiff's Exs. 11A–E; plaintiff testimony.

14. Southern Bell entered into an outside contract with Ansco and Associates, Inc. ("Ansco") effective July 1, 1987.

15. With Ansco personnel and equipment, Ansco was required to place the BSW at a depth of no less than twelve inches. Southern Bell was not obligated to pay for the job if this was not accomplished. Defendant's Proposed Findings of Fact and Conclusions of Law at 2; Lucas Deposition at 41.

16. In checking for depth, a PCS generally inspected three locations along each wire; all three locations had to be at least

---

1. Plaintiff is not making a salary gender discrimination claim. She merely offers this evidence in support of her disparate treatment claim.

2. Buried service wire is underground telephone wire. It connects a residential telephone customer's telephone to the Southern Bell network.

3. The volume of BSW jobs and invoices in plaintiff's district averaged approximately 1,000 per month, *see* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 4, thereby making it impossible for plaintiff to inspect every BSW. Sartin Deposition at 31.

twelve inches deep.[4] Plaintiff testimony; Lawson Deposition at 62. If the wire was buried at the proper depth, Southern Bell paid Ansco based on the length of the wire (a predetermined amount was paid for every 100 incremental feet of wire placed) and for the method of placement (a standard rate was paid if a plow was used to place the BSW; a higher rate was paid if Ansco personnel were required to hand dig a trench[5]).

17. Plaintiff found the shallowness of the wires to be a consistent problem and so reported this to her supervisors, both verbally and in writing.

a. In an August, 1987, meeting, plaintiff complained to her supervisors, Tommy Thompson and G.R. Sweeney, about shallow wires. Plaintiff testimony; Lawson Deposition at 28, 51.

b. On her quality inspection worksheet ("QIW") of September 26, 1987, plaintiff inspected twenty-eight sites and found at least one defect at every location (most were shallow). Plaintiff's Ex 24.

c. On her contractor's performance report of October 2, 1987 (representing the third quarter of 1987), plaintiff documented a number of problems, including shallow wires, unburied wires, wrong footage, and billing for hand trenched BSW when the BSW had actually been plowed. Plaintiff's Ex. 11.

d. On October 22, 1987, plaintiff wrote Lucas a letter informing him that Ansco was still lying about the method of placement and asked to discuss this problem with him. Plaintiff's Ex. 25.

e. On her contractor's performance report of January 5, 1988 (representing the fourth quarter of 1987), plaintiff informed her supervisors that many BSW jobs had to be hand trenched because Ansco's plow

was too large and ineffective. Plaintiff's Ex. 11F.

f. On her QIW of January 5, 1988[6] (covering the fourth quarter of 1987), plaintiff inspected ninety locations and concluded that *every* location was shallow (that is, buried at less than the required twelve inch depth).

Plaintiff testified that she noticed no improvement in Ansco's performance as a result of these revelations to her supervisors. Plaintiff's testimony.

18. On his contractor's performance report of April 14, 1988 (covering the first quarter of 1988), Marshall Lawson reported that over *97%* of wires he inspected were shallow. Plaintiff's Ex. 8. In addition, Lawson also reported billing inaccuracies regarding the method of placement.

19. Shortly after they began performing on the contract, Ansco complained to Southern Bell that their bills were not getting paid. Apparently, plaintiff and Lawson had not processed some invoices because they were dissatisfied with Ansco's work. In August of 1987, Thompson directed the PCSs not to hold up Ansco's money and to process invoices right or wrong, and if overbillings were later found, adjustments could be made at that time. Plaintiff testimony; Lawson Deposition at 51–55; Dowling Deposition at 63–64.

20. After becoming the new supervisor in Columbus, Lucas advised the PCSs to pay Southern Bell's bills from Ansco in accordance with company practices governing the handling of bills from vendors such as Ansco. Plaintiff testimony; Defendant's Proposed Findings of Fact and Conclusions of Law at 4.

21. Rodney Sartin, a Southern Bell staff manager, conducted a mini review of BSW on February 18, 1988, at the request of Lucas. Sartin Deposition at 20. Sartin

---

**4.** It is possible that the PCS could find a wire buried at a depth greater than twelve inches at one location and at a depth less than twelve inches at a different location, all along the same line. Ex. A (Material Undisputed Fact). If one of the three places along a BSW was found to be shallow, then the whole job was considered unacceptable. Plaintiff Testimony; Sartin Deposition at 52.

**5.** Ansco could hand trench only when a Southern Bell representative authorized it to do so.

**6.** This is the QIW that Southern Bell alleges plaintiff falsified.

inspected thirteen sites and discovered that Ansco had overbilled Southern Bell by $861.00. Plaintiff's Ex. 3. All of these sites had originally been inspected by Marshall Lawson. Sartin found two major problems: (1) an abnormally large percentage of wires placed and billed at the hand trenched rate; and (2) shallow wires.

22. A more in-depth review was conducted shortly thereafter, at which time Sartin inspected 103 random sites. The majority of sites had originally been inspected and processed by plaintiff. Sartin calculated that Southern Bell had been overbilled by $5,267.00. Of this amount, $1,383.00 was attributable to sites Lawson was supposed to have inspected. *See* Plaintiff's Ex. 30C. Shallow wires and wires billed as hand trenched when they were actually plowed were again found to be major problems.

23. Sartin summarized the findings of his two reviews in a March 24, 1988, investigative report, and concluded that both Morris and Lawson had failed to perform adequate quality inspections on Ansco work to assure accurate billing. Plaintiff's Ex. 6 at 3. Sartin further stated that the invoices had obviously not been returned to Ansco for correction. Sartin Deposition at 92.

24. Lawson admitted that there had been occasions when he would sign the invoice as inspected when he had not actually inspected the work. Plaintiff's Ex. 6 at 7.

25. Lucas acknowledged that the processing of an invoice for payment prior to PCS inspection, while uncommon, did occur; if an error was discovered when the PCS eventually inspected the BSW job, Southern Bell asked for their money back. Lucas Deposition at 103–04.

26. In conjunction with the mini reviews, Lucas reinspected four BSW sites plaintiff had reported as shallow on her QIW of January 5, 1988. Contrary to plaintiff's findings, Lucas found no BSW that were shallow. Lucas testimony. This led Lucas to conclude that plaintiff had never inspected any of the sites documented on her QIW, which in turn led to the falsification charges.

27. As mentioned earlier, plaintiff was relieved of her BSW duties in January of 1988. Following the mini reviews, Alan Edmonson, the decisionmaker in this case, determined that plaintiff had falsified her QIW of January 5, 1988. Plaintiff was discharged on April 20, 1988.

28. Alan Edmonson stated that he dismissed plaintiff because she falsified documents. These documents, in turn, resulted in the contractor being paid for work not performed. Edmonson concluded that plaintiff had not been performing the field inspections reflected on her QIW or else she would have prevented the field conditions reported in the investigative report from developing. Edmonson based his conclusion on the findings disclosed in the investigative report and the statements of I.S. Brown, Rodney Sartin, and Johnny Lucas. In making his decision to discharge plaintiff, Edmonson specifically referred to Sartin's statement that both plaintiff and Lawson failed "to perform adequate quality inspections on the contractor to assure acceptable billing quality and contract compliance on proper depth." Edmonson Deposition at 54–55. Edmonson was aware, therefore, that both plaintiff and Lawson had failed to conduct adequate inspections. Edmonson consciously overlooked Lawson's violation of a work rule when he decided to dismiss plaintiff.

29. Edmonson consulted with Lucas in reaching his decision to dismiss plaintiff. Edmonson Deposition at 61–62.

30. Edmonson also based his decision on the fact that, according to the investigative report, plaintiff did not advise her second level managers that Ansco was improperly burying the service wires at shallow depths or that it was engaging in fraudulent billing practices. This contradicts the court's finding of fact 17, *supra.*

31. Plaintiff never admitted to any wrongdoing on her part. She contends, in fact, that she did perform the inspections reflected on her QIW. Plaintiff testimony; Plaintiff's Proposed Findings of Fact and Conclusions of Law at 11. Furthermore,

plaintiff asserts that the alleged falsification of her QIW could not have resulted in Ansco being paid for work not performed because if the BSW jobs were in fact shallow, as she so reported, Ansco would not have been entitled to payment. *Id.* at 9.

32. With respect to the charge that plaintiff failed to inspect the sites she reported on her QIW of January 5, 1988, plaintiff proffered the testimony of a geologist to prove that she had in fact inspected the sites. On March 1, 1991, plaintiff's expert inspected the BSW sites that Lucas had reinspected (see finding of fact 26, *supra*). The expert testified that all of the sites were shallow (which is consistent with plaintiff's findings).[7] The court found the expert to be a credible witness. In addition, the court notes that the results of the second mini review revealed that out of 103 BSW, only 15 were buried at a proper depth. *See* Plaintiff's Ex. 5A. Plaintiff also pointed out that it was conceivable for two inspectors to reach different conclusions about the depth of BSW if they did not inspect at the same locations along a line. *See also* Sartin Deposition at 40. The court finds that the BSW were, in fact, shallow. Southern Bell has presented no reason, therefore, to convince that court that plaintiff failed to inspect the BSW sites.

33. The court finds, however, that plaintiff did violate a Southern Bell work rule by not returning invoices to Ansco for correction prior to processing them for payment. While it was true that Ansco would not be paid for shallow BSW jobs, it was plaintiff's responsibility to see to it that Ansco reburied the wires or readjusted its invoices so that they accurately reflected how the wires were placed before plaintiff forwarded the invoices on to her supervisors. Plaintiff presented no evidence that she had returned invoices to Ansco for correction. Furthermore, the February, 1988, mini reviews revealed that a number

of BSW which plaintiff was responsible for remained improperly buried and inaccurately billed. Plaintiff failed, therefore, to ensure that Ansco comply with its contract.

34. The court finds that the evidence established that Marshall Lawson, besides admitting he occasionally failed to inspect sites, was equally guilty of not requiring full compliance by the outside contractor prior to processing the invoices for payment. The February, 1988, mini reviews revealed that a number of BSW which Lawson was responsible for remained improperly buried and inaccurately billed.[8] Alan Edmonson was aware of this violation when he made his decision to dismiss plaintiff.

35. Southern Bell's assertions that Marshall Lawson's actions were dissimilar are unworthy of credence.

36. Except for a counseling record in 1984, plaintiff had never received disciplinary action for any reason prior to her discharge. Exhibit A (Material Undisputed Facts).

37. Plaintiff testified that her supervisors made a number of sexually biased remarks to her in the past. Tommy Thompson told plaintiff that he did not want to have a woman on his staff. Steedley testimony. G.R. Sweeney stated on at least five occasions that the job of contract supervisor was not a job a woman should have. Lawson Deposition at 84. While the court finds that these specific statements were in fact made, they do not relate to plaintiff's eventual discharge and had no influence on the ultimate decisionmaker, Alan Edmonson.

38. Plaintiff's expert witness, an economist, provided statistical evidence to establish that Southern Bell did not hire women because of their gender. Such undisputed evidence showed that there were 244 managers in the CIM division of Southern Bell in December of 1988. Fifteen of those, or

---

7. The expert witness stated that while lawn conditions may have changed, there had been no geological changes.

8. In his investigative report, Sartin also stated that Lawson failed to inspect work under the

Master Contract, an area separate from BSW, and processed invoices that should not have been paid because of substandard work. Plaintiff's Ex. 6 at 3.

6%, were women. The expert witness then offered statistical data to demonstrate that, in the absence of sexual bias, Southern Bell would have employed between 79 to 110 female managers.[9] The court finds that while not probative of discriminatory intent, plaintiff's statistical evidence does establish the existence of a significant under-representation of women in the managerial workforce of Southern Bell.

39. Both plaintiff and Lawson, her male counterpart, purportedly inspected BSW sites. Both recorded nearly identical findings: 100% BSW reported shallow by plaintiff for the fourth quarter of 1987 versus 97% BSW reported shallow by Lawson for the first quarter of 1988. Both were responsible for BSW that Ansco inaccurately billed. Both plaintiff and Lawson failed to return the invoices back to Ansco for correction. Both caused Southern Bell to be overbilled by significant amounts of money.

40. Circumstantial evidence establishes that Southern Bell treated plaintiff and Lawson differently because of their sexes. Plaintiff was fired for her actions while Lawson incurred no punishment for the same misconduct. The court finds that Southern Bell intentionally discriminated against plaintiff because she is a woman.

## DISCUSSION

In a Title VII disparate treatment action, the ultimate question is whether the defendant intentionally discriminated against the plaintiff. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Intentional discrimination is an issue of fact. *Pullman–Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982). Because direct evidence of discrimination is difficult to produce, the courts use a three-part procedure to analyze circumstantial evidence of discrimination. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must present a *prima facie* case of dis-

crimination. To establish a *prima facie* case of discrimination under *McDonnell Douglas,* plaintiff must prove that: (1) she was a member of a protected group; (2) she was qualified in her position as Plant Contract Supervisor; (3) she sustained adverse employment action by being terminated on April 20, 1988; and (4) her job duties were thereafter performed by a male employee. A presumption of discrimination arises if this burden is met. The court finds that plaintiff has established her *prima facie* case.

Next, the defendant must articulate a legitimate, nondiscriminatory reason for discharging the plaintiff. The defendant does not have to persuade the court that "it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981). The Eleventh Circuit has described the defendant's burden as "exceedingly light." *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1142 (11th Cir.1983). In the instant case, Southern Bell stated that it fired plaintiff because she falsified a quality inspection worksheet and permitted the contractor to be paid for inferior work. The court finds that defendant has satisfied its burden of production.

The burden, under *McDonnell Douglas,* now returns to the plaintiff to prove by significantly probative evidence that the proffered reasons are a pretext for discrimination. *Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). The plaintiff can rebut the defendant's articulated reason either directly, by showing that a discriminatory reason more likely motivated the defendant, or indirectly, by showing that the defendant's articulated reason is unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. In the context of discharge for violation of a work

---

9. Plaintiff's witness admits that in reaching his conclusions, he had to assume that men and women are equally attracted to the CIM division.

rule, the employee must establish pretext by showing either that she did not violate the work or that, if she did, male employees who engaged in nearly identical misconduct were not terminated. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1563 (11th Cir.1987).

This case turns, then, on whether plaintiff has demonstrated that Southern Bell's legitimate, nondiscriminatory reasons were pretextual. Plaintiff was unable to convince the court that she did not violate a Southern Bell work rule. She must rely, therefore, on the second above-referenced ground for finding pretext.

Southern Bell required its PCSs to withhold payment to the outside contractor if an invoice was inaccurate or if BSW were improperly buried. In August of 1987, a second level supervisor instructed plaintiff and Lawson to process the invoices prior to inspection to facilitate payment. In October of 1987, Johnny Lucas reinstructed the PCSs not to process an invoice unless the work reflected therein was accurate. Despite these instructions, both plaintiff and her male counterpart, Marshall Lawson, continued to process for payment inaccurate invoices for inferior BSW work that they purportedly inspected. Both committed the same violation, yet only plaintiff was fired. The results of a security investigation confirmed that both plaintiff and Lawson failed to ensure that Ansco was complying with the contract. Alan Edmonson, the decisionmaker, considered these results when he made his decision to fire only plaintiff. The court is persuaded that despite Southern Bell's proffered reasons, it was more likely than not that Southern Bell's decision to dismiss plaintiff was motivated by discrimination. Plaintiff, therefore, has proved that Southern Bell's reasons for dismissing her were pretextual.

Accordingly, let judgment be entered in favor of plaintiff. Pursuant to 42 U.S.C. § 2000e–5(g), plaintiff is entitled to immediate job reinstatement at the rate of pay that she would have been entitled to if she had never been dismissed and back pay less interim earnings. In addition, because plaintiff has prevailed on her discrimination claim she is entitled to an award of reasonable attorney's fees and costs in accordance with 42 U.S.C. § 2000e–5(k). The parties have two weeks to suggest a form of judgment effecting the court's order.

SO ORDERED.